MEMORANDUM OF DECISION
This case presents a petition for termination of parental rights brought by the Commissioner of the Department of Children and Families (DCF). The respondents, Cheri J. and Kenneth B., are the biological parents of Kenneth.
PROCEDURAL BACKGROUND
On July 1, 1997, DCF filed a neglect petition regarding Kenneth, who was six weeks old, alleging that the child was being permitted to live under conditions, circumstances or associations injurious to the child's well-being. On the same date the court entered an order of temporary custody with regard to Kenneth.
On December 10, 1997, Kenneth was adjudicated a neglected child and committed to the custody of DCF.
On December 7, 1998, the court made a finding that continuing efforts to reunify the family were no longer appropriate.
On March 4, 1999, DCF filed a petition to terminate the parental rights of Cheri and Kenneth.
With regard to Cheri, the petitioner alleged that the child had been found in a prior proceeding to have been neglected and the mother had failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the needs and age of the child, she could assume a responsible position in the life of the child. CT Page 3469Conn. Gen. Stat. § 17a-112 (c)(3)(B). The petitioner also alleged that there is no ongoing parent/child relationship with the mother that ordinarily develops as a result of a parent having met on a continuing basis the physical, emotional, moral, or educational needs of the child and to allow further time for the establishment or reestablishment of such parent/child relationship would be detrimental to the best interest of the child. Conn. Gen. Stat. § 17a-112 (c)(3)(D).
With regard to Kenneth, the petitioner alleged that the child had been abandoned in the sense that the parent failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. Conn. Gen. Stat.
§ 17a-112 (c)(3)(A). The petitioner also alleged that Kenneth has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time he could assume a responsible position in the life of the child. Conn.Gen. Stat. § 17a-112 (c)(3)(B). The petitioner also alleged that there is no ongoing parent/child relationship between Kenneth and his son. Conn. Gen. Stat. § 17a-112 (c)(3)(D).
On December 7, 1999, the court again found that continuing efforts to reunify the family were no longer appropriate.
For the reasons stated below, the court grants the termination petition with regard to Cheri and Kenneth.
FACTUAL FINDINGS
The court finds the following facts by clear and convincing evidence.
Between December of 1996 and April of 1997, Cheri abused drugs while pregnant with Kenneth. Kenneth was born on May 15, 1997. He was described by doctors as a "jittery" baby. Cheri was allowed, however, to bring the child home upon discharge from the hospital.
Only a week later, on May 22, 1997, Cheri was arrested on a charge of prostitution. Approximately two weeks after that she failed to appear for a court hearing.
In June of 1997, Cheri tested positive for cocaine use. On June 23, 1997, the Morris Foundation did a drug abuse evaluation of Cheri. It recommended that she engage in outpatient counseling on CT Page 3470 a weekly basis. Cheri did not follow through on this recommendation despite initially agreeing to participate in a program.
On July 1, 1997, the court granted an order of temporary custody with regard to Kenneth. On July 8, 1997, the court entered specific steps for both Cheri and Kenneth which included participating in drug evaluations and cooperating with recommendations, engaging in counseling and visiting the child as often as DCF permitted.[2]
On December 10, 1997, Kenneth was committed to DCF.
Cheri completed a parenting class on January 29, 1998. On February 24, 1998, Cheri was incarcerated for twelve days on convictions for failures to appear. Between February 19, 1998 and June 4, 1998, Cheri did not visit with her child and did not contact DCF to inquire as his welfare. As of the summer of 1998, Kenneth and Cheri were living in a motel and Kenneth had resumed using drugs. Cheri finally left Kenneth in August of 1998.
Despite multiple referrals by DCF, Cheri did not become involved in an outpatient drug program until more than a year after she lost custody of Kenneth. From August 27, 1998 through March 4, 1999, Cheri was fully compliant with outpatient treatment.[3]
In 1999, Cheri again voluntarily chose not to visit with Kenneth for a significant period of time. Specifically, she did not visit him between June and the beginning of September 1999, instead choosing to go to Texas to visit two of her other children for the summer. In total, Cheri missed twenty-two of thirty-eight scheduled visits with Kenneth in 1999.
In December of 1999, visitation was ceased between Kenneth and his biological parents pursuant to a court order. Kenneth had begun exhibiting troubling behavior both before and after visits including banging his head, pulling his hair and smashing his toys against the wall.
There is no documentation confirming that Cheri engaged in individual or group counseling which was one of the steps entered by the court. Cheri has not had stable housing since the child was placed with the Department. She has only been in her current residence for the last three months. CT Page 3471
KENNETH B.
Kenneth B. has had two drug relapses since his child was placed with DCF. On June 28, 1998, he was arrested for possession of narcotics. He also failed to appear at court and was charged with this violation. He was convicted on these charges and is currently on probation until July of 2002.
After he relapsed the second time, Kenneth went into an inpatient program at Stonington Institute beginning in November of 1998 and then a residential program which ended in April of 1999. He began attending an outpatient program at Southwest Community Health Center in October of 1999. To date he has missed twenty out of forty-seven sessions and has been discharged twice from this program for failure to attend. He testified that his absences were due to the two children who are residing with him being ill. Cheri testified, however, that her daughter, who has been living with Kenneth, has been healthy and the court does not find Kenneth's excuses for nonattendance credible. Kenneth's urinalysis tests have been negative since he went into the Southwest program.
Kenneth did complete a parenting program on January 29, 1998. Between March and June 1998, however, Kenneth was whereabouts unknown and did not visit or even inquire as to the welfare of his child. Kenneth also missed approximately one-half of his scheduled visits for the remainder of 1998. He then missed ten out of thirty-eight visits in 1999.
On December 15, 1999, Kenneth also missed a court ordered interactional evaluation with his son to assist in planning for visitation. He had no legitimate excuse for failing to attend this session.
REASONABLE EFFORTS
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF has "made reasonable efforts to locate the parent and reunify the child with the parent unless the court finds in the proceeding that the parent is unable or unwilling to benefit from reunification efforts."Conn. Gen. Stat. § 17a-112 (c)(1). The court need not make such a finding, however, "if a court has determined at a hearing pursuant to subsection (b) of section 17a-110 or section 17a-111b
CT Page 3472 that such efforts are not appropriate." Id.
The court made the requisite finding on both December 7, 1998 and December 7, 1999 that reunification efforts were no longer appropriate.
TERMINATION ADJUDICATION
A termination petition that can sever family ties implicates serious constitutional concerns. The United States Supreme Court held in Santosky vs. Kramer, 455 U.S. 745, 753 (1982) that: "the fundamental liberty interests of natural parents in the care, custody and management of their child does not evaporate simply because they have not been model parents where they have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life."
However, parents' constitutional rights do not exist in a vacuum without reference to the fights of others in the family. In particular, they do not override a child's right to be safe and to grow and to be nurtured in a supportive environment. As set forth in Conn. Gen. Stat. § 17a-101(a): "the public policy of this state is: to protect children whose health and welfare may be adversely affected through injury and neglect."
STATUTORY GROUNDS
To prevail in a non-consensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See Inre Michael B., 49 Conn. App. 510, 512 (1998); Conn. Gen. Stat.
§ 17a-112 (c)(3). In this adjudicatory phase, the court is limited to events preceding the filing of the petition or the latest amendment. See Practice Book § 33-3(a). The relevant date in this case is March 4, 1999.
FAILURE TO REHABILITATE
A statutory ground for termination arises when "the parent of a child who (1) has been found by the Superior Court to have been neglected or uncared for in a prior proceeding . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a CT Page 3473 responsible position in the life of the child." Conn. Gen. Stat.
§ 17a-112 (c)(3)(B). The statute requires the court to analyze the parents' rehabilitative status "as it relates to the needs of the particular child and further, that such rehabilitation must be foreseeable within a reasonable time." In re Luis C.,210 Conn. 157, 167 (1989).
No dispute exists that the court has previously found Kenneth to have been "neglected" thus satisfying a statutory prerequisite. The rest of the statute requires the court to find whether the facts "encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child."Conn. Gen, Stat. § 17a-112 (c)(3)(B). The court finds by clear and convincing evidence that the respondents, Cheri and Kenneth, have failed to rehabilitate within the meaning of the statute.
Kenneth has struggled with his crack cocaine addiction and has relapsed into drug usage twice since his son was placed with the Department. He was also arrested in June of 1998 for possession of narcotics. Accordingly, he has not complied with the specific steps requiring no substance abuse and no involvement with the criminal justice system.
Kenneth has also not kept his whereabouts known to the Department and has not visited with the child as often as DCF permits. He has voluntarily chosen not to visit with his child for significant periods of time while the child has been in foster care.
Because Kenneth was still struggling with his addiction, was involved with the criminal justice system and did not consistently visit with his son, the court finds by clear and convincing evidence that, as of the relevant adjudicatory date, Kenneth could not assume a responsible position in the life of his child within a reasonable time. Accordingly, the state has proven by clear and convincing evidence that Kenneth has not rehabilitated within the meaning of the statute.
Cheri was also incarcerated after the child was placed in DCF's custody and did not follow recommendations for outpatient drug treatment until August of 1998. By that time Kenneth had already been in foster care for over a year. Cheri also voluntarily chose to not visit her child for four months in 1998 and did not even stay in touch with DCF to inquire about his welfare. It is CT Page 3474 fundamental that a parent must demonstrate the ability to be consistent in their contact with their child in order to prove rehabilitation to the status of a responsible parent.[4] If a parent cannot even make it to scheduled visits, or chooses not to, she is clearly not prepared to care for the child on a regular basis with or without services. Cheri has also not had a stable living arrangement, moving from town to town and apartment to apartment. For all these reasons, the court finds by clear and convincing evidence that Cheri failed to rehabilitate within the meaning of the statute.
ABANDONMENT
The petition alleges that Kenneth has been abandoned by his father "in the sense that the parent failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child." Conn. Gen. Stat. § 17a-112 (c)(3)(A). "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of the child." In re Migdalia, 6 Conn. App. 194, 208-209, cert. denied,199 Conn. 309 (1986). "Conversely, where a parent fails to visit a child, fails to display any level of affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id. at 209.
The petitioner has not proven by clear and convincing evidence that Kenneth has abandoned his son within the meaning of the statute. Kenneth sporadically attempted to visit with his son and displayed affection and a good visiting relationship with his child as of the relevant adjudicatory date.
NO ONGOING PARENT/CHILD RELATIONSHIP
Petitioner also alleges that Kenneth and Cheri had no ongoing parent/child relationship with their son that ordinarily develops as the result of the parent having met on a day-to-day basis, the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such a parent/child relationship would be detrimental to the best interest of the child. Conn. Gen. Stat. § 17a-112 (c)(3)(D). The Connecticut Supreme Court in In re Jessica M., 217 Conn. 459
(1991) found that termination on these grounds is inappropriate unless "the child has no present memories or feelings for the CT Page 3475 natural parent" or that if such child does have some memories, "no positive emotional aspects of their relationship survive."Id. at 468. Kenneth appeared to enjoy a comfortable relationship with his parents during the time he actually spent with them during visits. The court finds that the petitioner has not proven by clear and convincing evidence that as of the relevant adjudicatory date there was no ongoing parent/child relationship within the meaning of the statute. The petitioner failed to demonstrate by clear and convincing evidence that no positive emotional aspects of Kenneth's relationship survived with his parents.
MANDATORY FINDINGS
With respect to Cheri and Kenneth, as required by Conn. Gen.Stat. § 17a-112 (d), the court makes the following findings:
1. The timely nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
The respondents were offered numerous substance abuse treatment referrals and were also offered visitation with Kenneth despite having months of no contact with DCF.
2. Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance Child Welfare Act of 1980.
The parents were offered regularly scheduled visits with Kenneth despite not being in contact with the Department for months at a time. The Department also offered the parents numerous referrals for substance abuse treatment. While there is an issue whether the parents had to seek out domestic violence and family counseling on their own, on balance the Department did make reasonable efforts to reunite the family.
3. The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
Kenneth did not comply with the majority of steps that were entered by the court. He engaged in substance abuse and was involved with the criminal justice system. While he eventually CT Page 3476 sought drug treatment after each relapse that he suffered, he has recently been discharged for the second time from his current outpatient drug treatment program. He did not visit the child as often as DCF permitted, missing the majority of visits in 1998.
Cheri did not engage in outpatient drug treatment until August of 1998 and to date has not provided the Department with written proof of completion of this program. She also did not visit the child as often as DCF permitted. She has also not maintained stable housing.
4. The feelings and emotional ties of the child with respect to his parents, any guardian and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
Kenneth is bonded with his foster parents. He has lived with them since he was six weeks old and views them as his psychological parents. They have provided him with a nurturing, loving and stable environment. He becomes by any perceived threat to his relationship with his foster parents such as being told by his biological mother to call her "mommy" and call his foster mother "Miss Mary." His foster mother has diligently worked to get Kenneth the special services he needs to address his developmental delays. In 1999, Kenneth began reacting negatively to visiting with his parents both before and after the visits although he seemed to enjoy a comfortable relationship with them during the time he actually spent with them during visits.
5. The age of the child.
Kenneth is two years and nine months old.
6. The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, and not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and, (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Both parents have engaged in very inconsistent visitation with CT Page 3477 Kenneth going for long periods of time with absolutely no contact.
7. The extent to which a parent has been prevented from maintaining a relationship with the child by the unreasonable act or conduct of the other parent of the child or the unreasonable act of any other person, or by economic circumstances of the parent.
While DCF was not as helpful as it could have been in transporting the parents to visits, no unreasonable acts prevented these parents from having contact with their child.
DISPOSITION
In the dispositional phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child."Conn Gen. Stat. § 17a-112 (c)(2). The court can consider all events occurring through the close of the dispositional hearing. Connecticut Practice Book 33-5.
Kenneth has lived with his foster parents since he was six weeks old. He is now almost three years old. Dr. Bruce Freedman found that it would be devastating for Kenneth to remove him from his foster family. He is closely bonded with his foster parents and views them as his psychological parents. Kenneth B. and Cheri J. maintained sporadic contact with Kenneth over the last three years. Cheri voluntarily chose to put two of her other children's interests ahead of Kenneth and went to visit them for the entire summer of 1999. While the parents were no doubt struggling with their own personal issues, it must have been emotionally devastating for this young child to go for months without seeing his parents and then not only be expected to interact with them but also be pressured to call them mommy and daddy.
By 1999, Kenneth had begun to have enough of his parent's inconsistent interest in him. He would vocalize his displeasure about having to go to visits and then react violently immediately after the visits were over. Visitation was finally ceased between Kenneth and his biological parents by court order in December of 1999.
Kenneth is in need of permanency and the court determines by clear and convincing evidence that it is in his best interest for CT Page 3478 a termination of parental rights to enter with respect to his biological parents. Accordingly, a termination of Cheri J. and Kenneth B.'s parental rights is ordered. It is further ordered that the Commissioner of DCF be appointed statutory parent for Kenneth for the purpose of securing an adoptive home. The Commissioner shall file with this court, no later than 60 days following the date of judgment, a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
CHASE T. ROGERS JUDGE OF THE SUPERIOR COURT
[2] One of the exhibits provides that between November 1997 and December 1997, Cheri went for inpatient drug treatment at Guenster Rehabilitation Center and successfully completed this program. In October of 1998, Guenster did another drug evaluation of Cheri at the request of DCF. This evaluation states that mother admitted that she reverted to drug usage after the residential program in December of 1997, however, the record is conflicting because the evaluation also states that Cheri stated that the last time she used drugs was June of 1997. While not critical to its decision, the Court suspects that Cheri actually completed this program in December of 1996 and then started using drugs again prior to Kenneth's birth in May of 1997.
[3] On October 1, 1998, Guenster again recommended outpatient treatment for Cheri which she had already begun in August.
[4] While there was some disturbing evidence presented that DCF was not helpful on some occasions in transporting Cheri to visits, the court finds that, based on the record as a whole, Cheri chose to not visit Kenneth as often as DCF permitted.